UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| AMY LASCOLA | * | CIVIL ACTION NO. 19-154 |
| | * | |
| VERSUS | * | SECTION: "I"(1) |
| | * | |
| ANDREW SAUL, COMMISSIONER OF | * | JUDGE LANCE M. AFRICK |
| THE SOCIAL SECURITY | * | |
| ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************ | * | |

REPORT AND RECOMMENDATION

The plaintiff, Amy Lascola, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Act, 42 U.S.C. §§ 423, 1381. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 11) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 13) be GRANTED.

**Procedural Background**

On September 30, 2013, Ms. Lascola applied for DIB asserting a disability onset date of October 1, 2012. R. a 119. She alleged the following illnesses, injuries, or conditions: bipolar, anxiety disorder, sciatica, scoliosis, herniated discs and pinched nerves in neck and back, arthritis, and cervicalgia. Id. On October 31, 2013, Ms. Lascola applied for SSI asserting the same disability onset date and same illnesses, injuries, and conditions. R. at 107.  On February 18, 2014, her claims were denied by the state agency. R. at 155-56.

1

Ms. Lascola obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September February 4, 2015[1] before Christopher Juge. R. at 41. ALJ Juge issued an adverse decision on April 10, 2015. R. at 172. Ms. Lascola timely appealed to the Appeals Council, which granted the request for review on October 20, 2017, ordering the matter remanded to an ALJ for further evaluation of the severity of Ms. Lascola's mental impairments and for consideration of a third-party function report completed by Ms. Lascola's father, which was not addressed by the ALJ's decision. R. at 179-80. The ALJ was also instructed to obtain evidence from a medical expert to clarify the nature and severity of Ms. Lascola's psychological impairments, if necessary; to give further consideration to Ms. Lascola's "maximum residual capacity during the entire period at issue," to obtain additional evidence from the treating source if necessary; to evaluate whether Ms. Lascola could perform her past relevant work; and, as warranted, to obtain evidence from a vocational expert to clarify the effect of the assessed limitations on Ms. Lascola's occupational base. R. at 180-81.

On remand from the Appeals Council, ALJ Mary Gattuso was assigned and a hearing was conducted on November 2, 2017. R. at 56. ALJ Gattuso issued an adverse decision on December 29, 2017. R. at 29. Ms. Lascola again timely appealed to the Appeals Council, which denied review on November 7, 2018. R. at 1.

On January 9, 2019, Ms. Lascola filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 7, 8). The parties filed cross-motions for summary judgment. (Rec. Docs. 11, 13). Ms. Lascola is represented by counsel.

---

[1] The hearing was originally scheduled for September 4, 2014, but Ms. Lascola was hospitalized for an emergency gastrointestinal issue and was unable to attend. R. at 103-04.

**Evidence in the Record**[2]

*Hearing Testimony*

At the February 4, 2015, hearing before the ALJ, Ms. Lascola testified that during the past 15 years, she had worked part-time for Bath and Body Works, full-time as a manager at Smoothie King where she primarily stood and lifted up to 10 pounds, as a medical statement clerk primarily sitting and lifting up to 10 pounds, and as a bartender at two daiquiri shops where she primarily stood and lifted up to 25 pounds. R. at 64-65. She explained that she stopped working in 2012 because of a combination of neck and back pain, panic/anxiety attacks, and depression. R. at 66. She said she had not tried looking for work since that time because she knows she is not going to be able to tolerate it for very long. R. at 73.

Ms. Lascola reported treating her panic attacks with medication and with one-on-one and group therapy sessions. R. at 66. Her attorney asked whether she has experienced a change in the severity of her panic attacks since 2012, and she responded "[i]t's stayed just pretty bad." Id.

In a typical panic attack, her blood pressure goes up, she cannot concentrate, she starts shaking, she does not make any sense, she cannot stand to be around other people, and she often says inappropriate things to other people. R. at 67. She reported experiencing panic attacks at least twice a week. Id. Sometimes they last a few minutes, and other times they can be a couple of hours. R. at 79. With regard to concentration, she added that she has racing thoughts and cannot concentrate on any one thing. R. at 67. She testified that she has trouble remembering things and has to write things down. R. at 67-68. She explained that her pain also clouds her concentration.

---

[2] The court here summarizes the evidence cited by the parties or otherwise relevant to the instant motions. The court notes that it considered not doing so in light of the particularly detailed recitation contained in the ALJ's decision on remand rendered on December 29, 2017. R. at 12-29.

R. at 68. She testified that she likes to watch movies on TV, but most of the time she has difficulty focusing or concentrating when watching a movie. R. at 71.

Ms. Lascola testified that she does not have any social interactions and she pretty much isolates herself to her house. R. at 68. She reported that she and her husband separated about three years ago, but she had been living with him for the last few months because it was the only place she had to go. R. at 69. Before that, she was living with her father and his wife. R. at 70. Ms. Lascola suspected that her instabilities and mood swings resulted in them asking her to find somewhere else to live. Id. She reported having altercations with her father's wife a couple of times. Id.

Ms. Lascola reported doing light chores like dishes or laundry, but said she could not physically clean the bathrooms or vacuum. R. at 71. She stated that after her neck surgery and with the pain in her back, she cannot lean over to scrub or do the repetitive motion of vacuuming or mopping. Id. She reported having difficulty lifting objects. Id. She said she could lift about five pounds. R. at 72. She testified that she has difficulty standing for long periods of time. R. at 73. She reported being very uncomfortable after sitting for about 15 minutes during the hearing. R. at 73. She said she always has to adjust her position. Id.

Ms. Lascola testified that she is able to drive and usually does so about once a week to grab a few groceries or to attend a doctor's appointment. R. at 74. She reported seeing her psychiatrist once a month and following up with her neurosurgeon every three months. Id.

Ms. Lascola testified that she had a double fusion at C4 through C6 in her neck, but that the surgery did not help at all. R. at 75. She reported that although she also had a lot of pain in her back, they had focused on her neck because it was falling forward. Id. She explained that she did not receive much care from January 2015 through the end of 2016 because she did not have

insurance. R. at 77. She was able to see a pain management doctor during that time period because she received some assistance from her husband. R. at 78. She was able to obtain mental health care because it was a free service. Id.

Ms. Lascola reported having periods of sobriety and a couple of relapses. R. at 81. She reported her last drink was in July 2015, about two years earlier. Id. She still tries to attend Alcoholics Anonymous meetings once or twice a month. Id.

Ms. Lascola was reluctant to testify that medication helps her psychological condition, but said that without anything she would be a lot worse. R. at 82.

After Ms. Lascola finished testifying and examination of the vocational expert began, the ALJ noted that Ms. Lascola was standing. R. at 85.

*Vocational Expert Testimony*

The vocational expert characterized Ms. Lascola's past work as:

1. Collections clerk (DOT Code 241.357-010, sedentary, skilled, with SVP of 5) combined with billing clerk (DOT Code 214.482-010, sedentary, semi-skilled, with SVP of 4);

2. Manager food service (DOT Code 189.167-018, light, skilled, with SVP of 7);

3. Management trainee (DOT Code 189.167-017, light, skilled, with SVP of 6) combined with bartender (DOT Code 312.474-010, light, semi-skilled, with SVP of 3); and

4. Secretary (DOT Code 201.362-030, sedentary, skilled, with SVP of 6).

R. at 86-87.

The ALJ asked the vocational expert to consider a hypothetical person with Ms. Lascola's age, education, and past work experience, who would be off task for at least 15 percent of the workday. R. at 88. The vocational expert testified there would be no work that individual could perform in the local or national economy. Id.

The ALJ next asked the vocational expert to consider a hypothetical person with Ms. Lascola's age, education, and past work experience, limited to light work except the individual could never climb ladders, ropes or scaffolds. Id. The individual could occasionally climb ramps and stairs and occasionally balance, stoop, crouch, kneel, and crawl. Id. The individual could not work with moving and/or dangerous machinery. Id. The individual could not work at unprotected heights. Id. The individual could not do work that involves strict production quotas such as an assembly line or fast paced work such as behind the counter in a fast food establishment. Id. The individual cannot do work that requires direct interaction with the public while carrying out job duties such as the job of a cashier. Id. The vocational expert testified that such an individual could not return to Ms. Lascola's previous work. R. at 89. However, the vocational expert testified there would be other work this individual could do, including: marker (DOT Code 209.587-034, SVP of 2) with 292,000 positions in the United States; router (DOT Code 222.587-038, SVP of 2) with 54,000 positions in the United States; and housekeeping cleaner (DOT Code 323.687-014, SVP of 2) with 135,000 positions in the United States. Id.

The ALJ then asked the vocational expert to consider the same individual but add the limitation that the person can only have occasional superficial interaction with co-workers and supervisors. Id. The vocational expert testified that this would not change her previous conclusion about the jobs. Id.

The ALJ then asked the vocational expert to consider the same individual but add that the individual cannot do overhead work. Id. The vocational expert testified that this would eliminate the housekeeping cleaner position, but the other jobs would remain. R. at 90.

Finally, the ALJ asked the vocational expert to consider the same individual but include the additional limitation that the person could do fine and gross manipulations frequently, but not

constantly with the upper extremities. Id. The vocational expert testified that this would not change her testimony about the jobs. Id. The ALJ asked if additional jobs were available, and the vocational expert testified that the hypothetical individual could also perform the job of routing clerk (DOT Code 222.687-022, SVP of 2) with 41,000 positions in the United States. Id.

*Mental Health Records*

Ms. Lascola presented at Jefferson Parish Human Services Authority ("JPHSA") on January 9, 2012, complaining of alcohol dependence. R. at 559.

Ms. Lascola presented at JPHSA on December 17, 2012 seeking treatment for anxiety, depression, and high blood pressure following her discharge from a rehab center where she was treating for alcohol abuse. R. at 515. On December 19, 2012, a psychological assessment was completed with licensed clinical social worker Bertrille Hoofkin. R. at 516. Ms. Lascola reported decreased sleep, increased irritability, racing thoughts, difficulty concentrating, poor memory, feelings of hopelessness, lacking energy and motivation to complete daily tasks, isolating, and crying spells. R. at 545.

On December 20, 2012, she returned to JPHSA for medication management with advanced practice registered nurse Marianne Call. R. at 517. She reported she was more anxious than depressed. Id. Her affect was appropriate, her mood was anxious, her eye contact was good, and her alertness was normal. Id. She had a cooperative attitude, her thought processes were logical, her concentration, intellect, insight, and judgment were good. R. at 581. Her memory was intact. Id. Her prescription for Trazodone was increased to 100mg, she was started on Lexapro, and she planned to attend group therapy. Id.

Ms. Lascola returned to JPHSA on April 2, 2013, for medication management. R. at 521. She reported sleeping better but dealing with a lot of anxiety. R. at 521. Her affect was appropriate,

her mood was anxious, her eye contact was good, her affect was appropriate, and her speech was within normal limits. Id. Her concentration was good and her memory was intact, but her intellect, insight, and judgment were fair. R. at 522. Lexapro was increased to 20mg and Trazadone was increased to 150mg. Id.

On April 12, 2013, Ms. Lascola attended a therapy session with Julia Kocian. R. at 660. She complained of constant anxiety and panic attacks once every two weeks. Id. The attacks were followed by a couple of days of depression. Id. She presented as scattered, talking rapidly, anxious, and happy. Id. Her thinking was rational and she was oriented to time and place. Id. Her intellect was normal and her judgment was sound. Id. It was noted that her Lexapro and Trazadone prescriptions would be increased per her physician. Id.

At her May 31, 2013, therapy session with Julia Kocian, the same complaint of constant anxiety and panic attacks once every two weeks followed by depression was noted. R. at 1046. Ms. Lascola presented as relatively calm, with mild anxiety. Id. Her thinking was rational and she was oriented to time, place, and person. Id.

On June 14, 2013, Ms. Lascola presented for a therapy session with Julia Kocian. R. at 666. The same complaint of constant anxiety and panic attacks once every two weeks followed by depression was noted. Id. She presented as relatively calm, with mild anxiety. Id. Her thinking was rational, and she was oriented to time, place, and person. Id. It was noted that she had difficulty walking and moving due to pain. Id. Her mood was even but she was tearful at times. Id. It was noted that she relapsed with alcohol after her last session. Id.

On July 3, 2013, Ms. Lascola presented for a therapy session with Julia Kocian. R. at 530. The same complaint of constant anxiety and panic attacks once every two weeks followed by depression was noted. Id. It was noted that her medication was working well, but she would see

her nurse practitioner about increasing the dosage. Id. She reported panic attacks were less frequent and less severe, but still occurred occasionally when she felt overwhelmed with duties and closely watched by her ex-husband. Id. Her goal was to improve coping in regard to anxiety, to discover ways to maintain sobriety that do not include AA because of her distaste for the program, and to improve interpersonal relationships with various family members. Id.

Ms. Lascola's July 17, 2013, therapy session with Julia Kocian was focused on Ms. Lascola's motivation to stay sober. R. at 1051.  Her problem and goals were the same as on July 3, 2013. Id.

On July 24, 2013, Ms. Lascola presented at JPHSA for medication management. R. at 1073. Her mood was depressed, but her affect was appropriate and her speech was within normal limits. Id. She denied drinking for the past two months. Id. Her concentration, intellect, insight, and judgment were good. R. at 1074. Id. She was continued on Lexapro, her prescription for Trazaone was increased, and she was started on buspar. Id.

On October 2, 2013, Ms. Lascola presented for a therapy session with Julia Kocian. R. at 672. Problems were noted to be anxiety, loss of appetite, and financial instability. Id.

On October 7, 2013, Ms. Lascola presented for medication management at JPHSA. R. at 536. Her affect was intense, her mood was anxious, her speech was rapid, pressured, and verbose. Id. Her concentration, intellect, insight, and judgment were fair. R. at 537. She reported the buspar did not agree with her so she stopped taking it. R. at 537. She was started on Abilify and Lexapro and Trazodone were continued. Id.

A JPHSA diagnostic review form dated November 4, 2013, lists diagnoses of major depression, anxiety, and alcohol dependence. R. at 557.

On January 2, 2014, Ms. Lascola presented at JPHSA for a medication management appointment. R. at 638. She reported sleeping well, but that she continued to be jittery and was hungrier. Id. She reported that her anxiety had not improved and she thought that Abilify was making it worse. Id. Her mood was noted to be anxious, her affect was appropriate, her speech was within normal limits though pressured, and her attitude was within normal limits. Id. Her concentration, intellect, insight, and judgment were good. R. at 639. Abilify was discontinued, Seroquel was started, Trazadone was decreased, and Lexapro was continued. Id.

On February 6, 2014, a consultative examination was performed by Lester Clayton Culver, Ph.D, upon referral by the state agency. R. at 574. Ms. Lascola reported panic attacks and periods of depression and stated she was being treated for bipolar. Id. She reported crying at least once a week and admitted to daily hopelessness and worthlessness. R. at 575. It was noted that she could sustain attention and persistence adequate to watch television for thirty minutes. R. at 577. Dr. Culver observed Ms. Lascola had no unusual motor behavior, no hyperactivity, and no compulsions or rituals. Id. Dr. Culver found Ms. Lascola had adequate motivation, was able to follow simple commands, could do simple addition and subtraction of integers, was alert and not distracted, was able to repeat six digits forward and backward, and was able to repeat four nouns on the second trial and could recall two of the four after five minutes. R. at 578. Ms. Lascola's affect was anxious, sad, and interested. Id. Dr. Culver concluded that Ms. Lascola:

> appears to be an avoidant personality disorder who is severely depressed and anxious. Intellectual functioning is at least normal. She is alcoholic and does not have enough sobriety to manage her funds. [Her] effort was adequate, but her attention was reduced by her affect. [She] had minor difficulty relating to me and is managing social anxiety and depression by living a very restricted social life. [She] had moderate difficulty tolerating testing and would not be able to deal with the stress common on most jobs.

Id. The diagnoses were avoidant personality disorder, social phobia, agoraphobia, and moderate alcohol use disorder, in early remission. R. at 578-79.

Ms. Lascola returned to JPHSA on January 30, 2014, for medication management. R. at 641.She reported sleeping better and that her anxiety was better, but she reported some racing thoughts around mid-day. Id. Her mood was anxious, her speech was within normal limits, her attitude was cooperative, her affect was appropriate. Id. Her concentration, intellect, insight, and judgment were good. R. at 642. Lexapro was decreased, Seroquel and Trazodone were continued. Id.

Ms. Lascola presented at JPHSA on May 29, 2014, for medication management. R. at 647. She reported that she continued to have problems sleeping, waking up 3 hours after she falls asleep with racing thoughts. Id. She also reported anxiety in the late afternoon and evening. Id. She reported having spells of talking fast and not being able to control her thoughts. Id. She also reported that her thoughts were clearer since Lexapro was increased. R. at 648. Her eye contact was good, but she had tremors in her hands. R. at 647. Her affect was appropriate, her mood euthymic, her speech was within normal limits, and her attitude was cooperative. R. at 648. Her concentration, intellect, insight, and judgment were good. Id. Seroquel was increased, Trazodone was decreased, Lexapro was continued, and she was started on hydroxyzine. Id.

Ms. Lascola presented at JPHSA on July 25, 2014, reporting alcohol dependence in remission for one year, depression, insomnia, and anxiety in the afternoons. R. at 1091. She reported that Seroquel was helping a lot with getting her to sleep, but she has trouble staying asleep. Id. She requested to go back to Trazodone. Id. She reported that hydroxyzine is helping "a bit" with anxiety and racing thoughts, but it is still bothersome. Id. She had benign tremors in her hands, her eye contact was good, her mood was euthymic, her attitude was cooperative, and her speech

was within normal limits. Id. Her concentration, intellect, insight, and judgment were good. R. at 1092. Trazodone and hydroxyzine were increased. Id.

Ms. Lascola presented at JPHSA on September 11, 2014, for an after-care appointment. R. at 696. She reported being off her psychiatric medication for 4 days while in the hospital for intestinal blockage, but she said she had restarted her medication a week ago. Id. She reported that she had been doing well on medication and was looking forward to them working again. R. at 697. She was anxious and fidgety and reported racing thoughts. R. at 696. She had rapid, pressured speech. Id. Her mood was euthymic and her affect was appropriate. Id. She had tremors in her hands. Id. Her attitude was cooperative and her concentration, intellect, insight, and judgment were good. R. at 697.

Ms. Lascola presented at JPHSA on November 6, 2014, for medication management. R. at 699. She reported her mood had been good and she was sleeping well. Id. She reported racing thoughts "once in a while." Id. She said she was "doing well on meds." R. at 700. Her affect was appropriate, her mood euthymic, her attitude cooperative, and her speech was within normal limits. R. at 699. Her concentration, intellect, insight, and judgment were good. R. at 700.

On December 12, 2014, Ms. Lascola was cleared for substance abuse treatment. R. at 693. She began participating in group therapy for alcohol/drug dependence. R. at 1109. On December 22, 2014, her sobriety date was noted to be December 15, 2014. Id. Her affect was appropriate, her mood was euthymic, and her attitude was cooperative. Id. On December 24, 2014, her sobriety date was noted to be December 22, 2014. R. at 1110.  Her mood was dysthymic, but her affect was appropriate. Id. On December 29, 2014, her sobriety date was still December 22, 2014. R. at 1111. Her affect was appropriate, her mood euthymic, and her attitude was defensive. Id. On December 31, 2014, her sobriety date was still December 22, 2014. R. at 1112. Her mood was euthymic and

her attitude was appropriate. Id. On January 12, 2015, her affect was appropriate, her attitude was cooperative, and her mood was anxious. R. at 1062. On January 21, 2015, her mood was dysphoric and her affect was appropriate. R. at 1113.

In January 2015, her urine tested positive for alcohol and several opioids. R. at 703.

On May 28, 2015, she presented to Dr. Dorenhauer for medication management. R. at 1007. She reported doing much better with improved mood and feeling like herself again. Id. She reported only a couple of crying spells and down days in the previous month and decreased anxiety. Id. She was sleeping well and reported enjoying reading and watching TV. Id.

On September 3, 2015, a consultative psychological evaluation was performed by Scuddy Fontanelle, Ph.D., at the request of Ms. Lascola's counsel. R. at 720-24. He reviewed her medical records from JPHSA, two psychiatric reports, and a therapy record. R. at 720. He noted her mood was mildly depressed. R. at 723. Dr. Fontanelle opined that Ms. Lascola is fully able to understand work related duty and work responsibility. Id. However, her pace, persistence, and concentration may be variable due to mood issues. Id. He also opined that her relationship with coworkers and supervisors are a likely area of concern due to her low frustration secondary to pain systems. Id. Diagnostic impressions were major depression disorder, recurrent, mild to moderate, and anxiety disorder due to medical condition. Id.

*Physical Health Records*

On April 23, 2013, Ms. Lascola presented at Daughters of Charity complaining of back pain. R. at 500. She reported having disc problems a long time ago, and that she recently had a hysterectomy and since then it had worsened. Id. Upon examination, she had normal range of motion in her neck. Id. Straight-leg raising test was positive. R. at 501. X-rays of the cervical spine and a complete x-ray of the lumbosacral spine were ordered. Id. She was prescribed 800mg of

ibuprofen three times daily, 1000 mg of methocarbamol four times a day, and 100 mg of tramadol as needed for severe pain. Id.

The lumbar x-ray yielded an impression of bilateral L5 spondylolysis with grade 1 anterolisthesis on L5. R. at 509. The cervical x-ray yielded an impression of advanced degenerative change at C6-C7. R. at 510. An MRI was recommended for further evaluation. Id.

She returned to Daughters of Charity on May 24, 2013 to discuss her x-rays. R. at 500. An MRI of the cervical spine was ordered. Id.

In November 2013, her medications were noted to be ibuprofen, methocarbamol, and tramadol as noted above. R. at 512.

An MRI of the cervical spine was performed on December 2, 2013. R. at 822. Findings included normal alignment with straightening, mild reversal of the normal cervical lordosis, mild hypertrophic changes of the posterior facet joints, degenerative loss of disc height and signal at C6-C7, but otherwise the intervertebral disc spaces are preserved. Id. C6-C7 findings were prominent osteophyte/disk complex with bilateral moderate to severe neural foramina narrowing and mild spinal canal stenosis. R. at 823.

An MRI of the lumbar spine was also performed on December 2, 2013. R. at 825. There was no substantial degenerative change at L1-L5. Id. At L5-S1 findings included: dehydrated disc that extends beyond the expected margin of the S1 endplate; broad based, right foraminal disc protrusion which moderately compresses the exiting right L5 nerve root; and mild left neural foraminal narrowing without mass effect on the nerve. Id.

In January 2014, Miljana Mandich, M.D., conducted a consultative examination of Ms. Lascola at the request of the state agency. R. at 568-72. It was noted that Ms. Lascola performs all activities of daily living without assistance, including driving. R. at 569. Upon physical

examination, Dr. Mandich noted that Ms. Lascola had normal range of motion in her neck but complained of some pain along the paracervical muscles on both sides of the neck. R. at 570. She was guarding the lower back, limiting range of motion. Id. She complained of pain across the back at the waist level, with no radiation. Id. She could walk on heels and toes and squat more than halfway down and rise without support. Id. A straight leg test was negative bilaterally. Id. Neurological examination was intact. R. at 571. Dr. Mandich did not have access to Ms. Lascola's previous medical records, however, laboratory studies were obtained and  revealed an "S" shaped scoliosis measuring at 24 degrees and a spondylolisthesis at L5. Id. On the cervical spine, a severe degenerative disc at C6-C7 was revealed. Id. In the concluding summary, Dr. Mandich noted that Ms. Lascola ambulated without any difficulty and had normal gait and station. R. at 572. Ms. Lasola did not need an assistive device and had no abnormal curvatures of the spine. Id. Diagnoses included neck and low back pain and other aches and pains with no positive physical findings. R. at 571.

Ms. Lascola presented at Daughters of Charity on March 20, 2014, complaining of painful joints and swelling and to follow up after her MRI. R. at 598. She reported muscle spasms and joint stiffness. Id. She was not feeling tired or poorly. Id. A straight leg test was positive. R. at 599. Neurological motor exam demonstrated no dysfunction and reflexes were normal. Id. Prescriptions for ibuprofen, tramadol, and methocarbamol, were renewed. Id.

On May 26, 2014, Ms. Lascola presented to the University Medical Center – New Orleans ("UMC-NO") for neck pain, lower back pain, and pain in the upper extremities bilaterally. R. at 827. She reported pain was interfering with her normal activities, but that pain improves with pain medication. Id. She complained of numbness in the bilateral upper extremities. Id. She reported that physical therapy had not helped relieve pain. Id. She reported she had not had steroid

injections. Id. Upon examination, she moved extremities without difficulty or limitations. R. at 828. She had strength of 5 out of 5 in her upper and lower extremities bilaterally. Id. She was negative for Tinel's, Phalen's, Hoffman's, Babinski, and Clonus. Id. Sensation was intact. Id.

On July 7, 2014, she returned to UMC-NO complaining of pain that is 10 on a scale of 10 that is only mildly helped with pain medication. R. at 832. It was noted that an EMG revealed no evidence of radiculopathy. Id.

An MRI of the lumbar spine was performed on November 3, 2014, and no significant change compared to the December 2013 exam was revealed. R. at 835.

The records indicate that Ms. Lascola treated at Accurate Clinic with complaints of low back and neck pain from June 30, 2015, through June 23, 2016. On June 30, 2015, she reported suffering all the time. R. at 1200. On July 14, 2015, she reported her neck and lower back pain were the same. R. at 1196. On August 11, 2015, she reported constant sciatica pain. R. at 1192. On September 4, 2015, she reported the medication was not working well for her pain. R. at 1188. She was doing well on November 9, 2015 and December 7, 2015. R. at 1172, 1176. She reported pain from a broken ankle on January 5, 2016. R. at 1168. On February 2, 2016, and March 21, 2016, pain was reported to be well-controlled with medication. R. at 1160, 1164. On April 27, 2016, pain was reported to be not well controlled, apparently because she had run out of medication. R. at 1155, 1158.

She presented at UMC-NO on October 26, 2016, reporting increasing neck and back pain that radiates to both legs and arms and all fingers and toes. R. at 841. She also complained of painful knots in her back. Id. She had full strength, normal deep tendon reflexes, and a negative Hoffman's test. Id. She was referred to surgery for flank nodules, although it was noted they were not paraspinal and should not be evaluated by neurosurgery. R. at 842.

On December 8, 2016, a cervical MRI was performed. R. at 844. It showed bilateral neural foraminal stenosis at C6-C7. Id. No significant changes since the December 2013 study were noted. Id. A lumbar MRI was also performed. R. at 846. Id. Chronic discopathy, spondylolysis, grade 1 spondylolisthesis at L5-S1, and bilateral foraminal stenosis were noted. Id.

On January 4, 2017, Ms. Lascola returned to the clinic at UMC-NO and Dr. Sivia Gesheva noted that Ms. Lascola had last been seen two years earlier for back pain. R. at 848. Ms. Lascola complained of hand numbness and radiculopathy down to the elbow. Id. She reported dropping objects and having difficulty opening bottles. Id. She had motor strength of 5/5. Id. X-rays of the cervical spine on January 18, 2017, revealed chronic advanced deformities of the C6-C7 interspace. R. at 854. Both neural foramina were encroached and stenotic at C6-C7. Id.

On March 6, 2017, Ms. Lascola returned to UMC-NO. R. at 859. She had strength of 5/5. R. at 860. Due to increased uptake and increased subjective myelopathy symptoms, a 2 level fusion was recommended. R. at 860.

On April 25, 2017, Ms. Lascola underwent a C5-6, C6-7 anterior cervical discectomy with decompression of the spinal cord and osteophytectomy at R. at 902. It was noted that the MRI of her cervical spine showed a C5-C6, C6-C7 herniated disc and that Ms. Lascola had failed conservative treatment and had progression of symptoms. R. at 903. She tolerated the procedure well. R. at 904. Pre-operative history noted that she had no weakness and denied falling or gait instability. R. at 888. She was discharged on April 26, 2017 following drain removal. R. at 900. She was evaluated by a physical therapist prior to discharge. R. at 893. She ambulated with no episodes of unsteadiness, no loss of balance, and no significant gait deviations. R. at 894. Decreased functional independence secondary to decreased balance and endurance was noted. R. at 895. It was noted she would continue to benefit from physical therapy. Id. Ms. Lascola was also

17

evaluated post-operatively by an occupational therapist. R. at 889. Pain of 10 on a 10-point scale was noted. R. at 890. Range of motion and strength in the bilateral upper extremities was noted to be within functional limits distally. Id. Range of motion was limited to 90 degrees. Id. She was limited by pain but functional for basic activities of daily living. R. at 890. It was noted she had no significant functional limitations with self-care or functional mobility tasks. R. at 891. No further occupational therapy was indicated. Id.

On May 3, 2017, she was admitted to the hospital for observation after the development of a post-operative hematoma in the neck. R. at 906. She was treated with Decadron via IV and symptoms dramatically improved. Id. She was discharged the next day. R. at 908. A CT scan was performed. R. at 921. Impressions included post-operative changes, extensive asymmetrical anterior right neck soft tissue swelling "which could be postprocedural, but cellulitis and myositis cannot be excluded," and collection of fluid attenuation that could reflect postoperative fluid. R. at 792. While in the hospital, she consulted with a physical therapist, who noted that she was limited by impaired strength, balance, increased pain, and decreased activity tolerance and who recommended continued inpatient physical therapy to return to full functional independence. R. at 911.

Ms. Lascola returned to UMC-NO on May 15, 2017, reporting that her symptoms had not improved since her initial post operation improvement. R. at 930. She was noted to be generally weak, "but from lack of full effort." R. at 931. She was placed on a Medrol dose pack. R. at 931. She followed up on May 29, 2017, and reported that the Medrol dose pack had not resulted in improvement. R. at 932. She reported that she felt she was having a hard time walking and moving. Id. She requested narcotic pain medication three times. Id. A CT myelogram was ordered. R. at 933.

Ms. Lascola presented at the St. Tammany Parish Hospital Emergency Department on June 30, 2017 complaining of neck pain. R. at 799. She reported that she had turned her neck and felt a pop and was experiencing pain that radiates up into her posterior scalp as well as down her arm into her fingers. Id. She reported tingling to her fingers. Id. She was negative for back pain. R. at 800. An x-ray of the cervical spine was performed. R. at 801. The Emergency Room physician suggested that the radiculopathy may be short lived or she might need restudying. Id. No new weakness was noted. Id. It was noted that Ms. Lascola was "using a lot of narcotics, but she is still in the fresh postop timeframe." Id. She was diagnosed with cervical radiculopathy and neck pain. Id. Ms. Lascola was instructed to follow up with her orthopedist. Id.

Ms. Lascola returned to UMC-NO on July 18, 2017 for a cervical CT myelogram. R. at 935-36. Impressions included postsurgical changes, moderate bilateral neural foraminal stenosis at C6-C7, spinal canal within normal limits, and no cord compression R. at 944. A lumbar MRI was also performed. R. at 939.  Findings included Grade 1 spondylolisthesis and apparent spondylolysis at L5-S1, chronic discopathy with desiccation, vacuum phenomenon and erosion of the S1 endplate, and bilateral neural foraminal stenosis. Id. The rest of the intervertebral discs were within normal limits. Id.

Ms. Lascola attended physical therapy on August 23, 2017, and reported that she had experienced no relief from the C5-C7 surgery. R. at 949. She reported severe pain with intermittent radicular symptoms. Id. She reported that she had not followed up with neurosurgery in a few months. Id. She had pain during all neck and upper extremity movements. R. at 951. She had an 84% functional impairment according to the Neck Disability Index.[3] Id. She reported that these

---

[3]    The Neck Disability Index is a self-report questionnaire. See Neck Disability Index https://www5.aaos.org/uploadedFiles/NDI.pdf (last accessed Mar. 30, 2020, at 3:46 p.m.).

deficits had resulted in an impaired ability to perform activities of daily living and an inability to work. Id.

## Decision of the Administrative Law Judge

On remand, ALJ Gattuso found that Ms. Lascola meets the insured status requirements of the Act through June 30, 2014. Thus, she must establish a disability by that date to be entitled to DIB.

The ALJ determined that Ms. Lascola has not engaged in substantial gainful activity since October 1, 2012, the alleged disability onset date.

The ALJ determined that Ms. Lascola has the following severe impairments: degenerative disc disease of the spine and affective disorder. However, the ALJ determined that Ms. Lascola does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ next determined that Ms. Lascola has the residual functional capacity to perform light work, except that she can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; and can occasionally balance, stoop, crouch, kneel, and crawl. She cannot work with moving and/or dangerous machinery or work at unprotected heights. She cannot engage in commercial driving. She cannot perform overhead work. She can do fine and gross manipulations with the upper extremities frequently, but not constantly. She is limited to unskilled work that involves routine, repetitive tasks. She cannot do work that involves strict production quotas such as an assembly line or fast pace work such as working behind the counter in a fast food establishment taking and filling orders. She cannot do work that requires direct interaction with the public while carrying out job duties such as the job of a cashier. She can have only occasional and superficial interaction with supervisors and coworkers.

The ALJ determined that Ms. Lascola was born on November 12, 1974 and on the alleged disability onset date, she was 37 years old, which is defined as a "younger individual" age 18-49. The ALJ determined that Ms. Lascola has at least a high school education and is able to communicate in English. The ALJ determined that transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not Ms. Lascola has transferable job skills. Considering Ms. Lascola's age, education, work, experience, and residual functional capacity, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Ms. Lascola can perform. In coming to this conclusion, the ALJ considered the testimony of a vocational expert. Finally, the ALJ concluded that Ms. Lascola has not been under a disability, as defined by the Social Security Act, from October 1, 2012, through the date of decision.

## Statement of Issues on Appeal

Issue No. 1.    Whether the ALJ's decision that Ms. Lascola was not "disabled" under the Act prior to June 30, 2014 is supported by substantial evidence.

Issue No. 2.    Whether the ALJ's decision that Ms. Lascola was not "disabled" under the Act at the time of the decision on December 29, 2017, is supported by substantial evidence.

## Analysis

### I.  Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames

v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)). This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.   Entitlement to Benefits under the Act.

To be considered disabled under the Act, a claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

(1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe

impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id. An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

## I.     **Plaintiff's Appeal**.

*Issue No. 1.      Whether the ALJ's decision that Ms. Lascola was not "disabled" under the Act prior to June 30, 2014 is supported by substantial evidence.*

Ms. Lascola argues that substantial evidence does not support the ALJ's conclusion that she had the sustained ability to work during the 12 months leading up to June 30, 2014, the date her eligibility for DIB expired. She submits that the ALJ failed to separately consider whether a period of disability had been established for purposes of her Title II claim for DIB. Ms. Lascola insists that the ALJ should have found that Ms. Lascola was unable to work for a sustained period of 12 months as of June 30, 2014.

With regard to her mental health, Ms. Lascola cites therapy sessions on April 12, 2013, June 14, 2013, and October 2, 2013 as showing that she had an ongoing problem with racing thoughts, panic attacks, anxiety, and depression. (Rec. Doc. 11-1, at 4). In fact, while these records indicate reports by Ms. Lascola of anxiety and depression, the therapist's observations are less consistent. On April 12, 2013, Ms. Lascola reported constant anxiety and panic attacks once every two weeks and reported the attacks were followed by a couple of days of depression. Id. She

presented as scattered, talking rapidly, anxious, and happy. Id. Her thinking was rational and she was oriented to time and place. Id. Her intellect was normal and her judgment was sound. Id. At her June 14, 2013, therapy session, the same complaint of constant anxiety and panic attacks once every two weeks followed by depression was noted. R. at 660. Ms. Lascola presented as relatively calm, with mild anxiety. Id. Her thinking was rational, and she was oriented to time, place, and person. Id. Her mood was even but she was tearful at times. Id. At her October 2, 2013, therapy session, her problems were noted to be anxiety, loss of appetite, and financial instability. R. at 672. She reported a bad reaction to a recent change in medication and that she had scheduled an appointment for medication management. Id.

Ms. Lascola also complains that in January 2014, she was started on Seroquel, which she describes as a "strong anti-psychotic drug," but the ALJ did not mention this in her summary of the medical records. (Rec. Doc. 11-1, at 4-5). While the ALJ did not mention Seroquel in summarizing the January 2014 medication management appointment, the ALJ did consider the record, noting that Ms. Lascola reported that she was sleeping well but continued to be jittery, which she attributed to Abilify. R. at 19, 638. At that appointment, Ms. Lascola's mood was noted to be anxious, her affect was appropriate, her speech was within normal limits though pressured, and her attitude was within normal limits. R. at 638. Her concentration, intellect, insight, and judgment were good. R. at 639.

Ms. Lascola submits that the ALJ improperly discounted the opinion of the consultative examiner Dr. Culver[4] by stating that "[t]here was no mention of depression or anxiety by Dr.

---

[4] Dr. Culver concluded that Ms. Lascola:

> appears to be an avoidant personality disorder who is severely depressed and anxious. Intellectual functioning is at least normal. She is alcoholic and does not have enough sobriety to manage her funds. [Her] effort was adequate, but her attention was reduced by her affect. [She] had minor difficulty relating to me and is managing social anxiety and depression by living a very restricted social life. [She] had moderate difficult tolerating testing and would not be able to deal with the stress common on most jobs.

Culver," when in fact Dr. Culver had opined that Ms. Lascola "appears to be an avoidant personality disorder who is severely depressed and anxious." (Rec. Doc. 11-1, at 5); R. at 25. Of note, in summarizing Dr. Culver's report on page 19 of the decision, the ALJ considered Dr. Culver's opinion that Ms. Lascola appeared to be an avoidant personality disorder who is severely depressed and anxious. Additionally, as the Commissioner notes and as the ALJ recited in her summary of the report, Dr. Culver found Ms. Lascola had adequate motivation, was cooperative, was able to follow simple commands, was alert and oriented, was able to repeat six digits forward and backward, and was able to repeat four nouns on the second try and could recall two of the four after five minutes. R. at 578. Dr. Culver also observed Ms. Lascola had no unusual motor behavior, no hyperactivity, and no compulsions or rituals. R. at 577.

Importantly, as the Commissioner points out, in observing that Dr. Culver did not "mention" depression or anxiety, the ALJ accurately referenced Dr. Culver's failure to diagnose depression and anxiety. Dr. Culver diagnosed avoidant personality disorder, social phobia, and agoraphobia, but not depression or anxiety. R. at 577-78. As evidence of the ALJ's intent, immediately following the statement that Dr. Culver had not mentioned depression or anxiety, the ALJ noted that "none of the claimant's mental health providers rendered the diagnoses noted by Dr. Culver, yet the claimant had a longitudinal line of treatment at JPHSA."[5] R. at 25. Accordingly, the court finds no error in the ALJ's observation that Dr. Culver did not "mention" Ms. Lascola's depression and anxiety.[6]

---

R. at 578.

[5] Ms. Lascola's treatment records at JPHSA from December 2012 consistently reflect diagnoses of major depressive disorder, recurrent episodes, moderate; anxiety state unspecified; and alcohol dependence. E.g., R. at 518, 522, 533, 537.

[6] After considering Dr. Culver's failure to mention (diagnose) depression and anxiety and the fact that Ms. Lascola's treatment records with JPHSA did not reflect the Dr. Culver's diagnoses, the ALJ concluded that Dr. Culver's opinion that Ms. Lascola could not tolerate the stress of a normal job "based on a single examination" was of little probative value. Id.

Ms. Lascola also challenges the ALJ's statement that Ms. Lascola's symptom severity in May 2014 was mild, pointing out that at the May 2014 appointment, Ms. Lascola reported she continued to have problems sleeping, waking up 3 hours after she falls asleep with racing thoughts. R. at 647. She also reported anxiety in the late afternoon and evening as well as spells of talking fast and not being able to control her thoughts. Id. She adds that at this appointment her Seroquel prescription was increased and she was started on hydroxyzine for anxiety. R. at 648. But Ms. Lascola does not acknowledge that she also reported that her thoughts were clearer since Lexapro was increased. Id. Her eye contact was good. R. at 647. Her affect was appropriate, her mood euthymic, her speech was within normal limits, and her attitude was cooperative. R. at 648. Her concentration, intellect, insight, and judgment were good. Id.

Ms. Lascola also challenges the ALJ's assessment of her physical condition prior to June 30, 2014. She points to the cervical and lumbar spine MRI's performed in December 2013. The cervical MRI showed prominent osteophyte/disk complex with bilateral moderate to severe neural foraminal narrowing and mild spinal canal stenosis at C6-C7. R. at 823. The lumbar spine MRI showed right foraminal disc protrusion which moderately compresses the exiting right L5 nerve root. R. at 825. She points out that in November 2013, she was prescribed Ibuprofen 800mg and methocarbamol, as well as tramadol to be used as needed for severe pain. R. at 512. She points out that in March 2014, she presented at Daughters of Charity complaining of painful joints and swelling and to follow up after her MRI. R. at 598.

The Commissioner opposes Ms. Lascola's characterization of the evidence and insists that the ALJ's decision that Ms. Lascola was not disabled during the entire period from the alleged onset date through the date of decision is supported by substantial evidence. As to Ms. Lascola's mental condition, the Commissioner highlights evidence considered by the ALJ that more than

adequately supports the ALJ's conclusions. When Ms. Lascola treated at JPHSA, she generally presented with an anxious or depressed mood, but with appropriate affect, good eye contact, and good concentration, insight, and judgment. R. at 581, 1073-74, 638, 642, 647, 1092. At Ms. Lascola's July 3, 2013, therapy session, it was noted that her medication was working well, but she would see her nurse practitioner about increasing dosage. R. at 530. She reported panic attacks were less frequent and less severe, but still occurred occasionally when she felt overwhelmed with duties and closely watched by her ex-husband. Id. By November 2014, she reported she was doing well on medication, her affect was appropriate, her mood euthymic, her attitude cooperative, and her speech was within normal limits. R. at 699-700.

> The ALJ ultimately concluded that Ms. Lascola's treatment records reflected that:
>
> [h]er symptoms of the underlying psychopathology waxed and waned in severity, ranging from mild to moderate, but generally responded well to treatment. However, there were instances of non-compliance with medication or treatment recommendations as well as alcohol relapses. The overarching theme is one of family stressors, interpersonal relationships, financial stability, and physical complaints as driving forces in the claimant's treatment. Progress notes reflected on numerous occasions that the claimant was stable on the prescribed medications and the claimant reported that she felt good on the medications. While the claimant presented herself to the mental health providers as extremely limited as well as in her testimony at the hearing, of note is her presentation to the various medical providers who treated her for degenerative disc disease, and who, while noting her psychotropic medications in their records, also noted normal mental status examinations overall.

R. at 24. The ALJ nonetheless "considered the effects of the claimant's mental impairments in setting forth" the residual functional capacity assessment. Id. Indeed, the ALJ limited Ms. Lascola to only unskilled work that involves routine, repetitive tasks; no work that involves strict production quotas such as an assembly line or fast pace work such as working behind the counter in a fast food restaurant; no work requiring direct interaction with the public; and no work requiring more than occasional and superficial interaction with coworkers and supervisors. R. at 17. The

court finds that substantial evidence supports the ALJ's conclusion that these functional limitations adequately addressed Ms. Lascola's mental impairments during the period of DIB coverage. The alleged errors in the ALJ's summary of the evidence of Ms. Lascola's mental condition are insufficient to call the ALJ's determination into question.

As to the evidence of Ms. Lascola's physical condition, the Commissioner correctly points out that the ALJ considered the medical records cited by Ms. Lascola here in coming to her decision. R. at 21. Indeed, in addition to the records above, the ALJ summarized Ms. Lascola's April 2013 complaints of back pain that resulted in x-rays showing advanced degenerative changes at C6-C7 and bilateral L5 spondylolysis. R. at 501, 509. The ALJ also referenced Ms. Lascola's January 2014 consultative examination with Dr. Miljana Mandich, who diagnosed neck and low back pain. R. at 571. The ALJ noted that the neurological examination was intact and that Ms. Lascola was able to perform all activities of daily living without assistance, including driving. R. at 569, 571. She could walk on heels and toes and squat more than halfway down and rise without support. R. at 570. The straight leg raise test was negative bilaterally. Id. Spondylolisthesis at L5 and a severe degenerative disc at C6-C7 were observed on x-rays. R. at 571. Dr. Mandich noted that Ms. Lascola had normal range of motion in her neck and limited range of motion in her lower back. Id. She ambulated without any difficulty and had normal gait and station. R. at 572. She did not need an assistive device. Id.

Importantly, the ALJ incorporated numerous physical limitations into the assessed residual functional capacity, including a limitation to only light work; no climbing of ladders, ropes or scaffolds; only occasional climbing of ramps and stairs and balancing, stooping, crouching, kneeling, and crawling; no work with moving or dangerous machinery or at unprotected heights; no commercial driving; and no overhead work. The court finds that substantial evidence supports

the ALJ's assessment that the foregoing limitations sufficiently address Ms. Lascola's physical impairments during the period of DIB coverage.

Ms. Lascola has pointed to evidence of her physical and mental impairments that support some limitations. At best, she asks this court to reweigh the evidence and come to a different conclusion than the ALJ. But as noted above, this court's role on review is simply to determine whether the ALJ's decision is supported by substantial evidence. It is true that the ALJ did not separately conclude that Ms. Lascola was not disabled before June 30, 2014. Instead, the ALJ concluded that Ms. Lascola was not disabled during the entire period from the disability onset date through the date of decision. The ALJ did so after reviewing and assessing the evidence from the entire period. When the ALJ's analysis for the pre-June 30, 2014, time period is isolated, as above, the court finds that the ALJ's assessment of Ms. Lascola's impairments as to that time period is supported by substantial evidence; that is, there is sufficient evidence that a reasonable mind might accept as adequate to support the ALJ's conclusion that Ms. Lascola was able to perform work at the assessed residual functional capacity for the pre-June 30, 2014 period.

*Issue No. 2.    Whether the ALJ's decision that Ms. Lascola was not "disabled" under the Act at the time of the decision on December 29, 2017, is supported by substantial evidence.*

Ms. Lascola also challenges the ALJ's conclusions as to Ms. Lascola's physical impairments at the time of decision. She submits that the only consulting examination concerning Ms. Lascola's physical condition was performed in February 2014, and the state agency non-examining expert also rendered his opinion at that time. Yet, Ms. Lascola underwent a two-level cervical discectomy and fusion on April 25, 2017. She points out that she was hospitalized for a post-surgery hematoma in early May 2017. R. at 906, 908. Ms. Lascola returned to UMC-NO on May 15, 2017, reporting that her symptoms had not improved since her initial post operation

improvement. R. at 930. She followed up on May 29, 2017, reporting that she felt she was having a hard time walking and moving. R. at 932.  Ms. Lascola also points out that in her August 23, 2017 physical therapy appointment, she reported pain during all neck and upper extremity movements, poor seated posture, impaired cervical and bilateral shoulder range of motion, and decreased bilateral upper extremity strength. R. at 951. According to the Neck Disability Index, she had an 84% functional impairment and was to begin a six-week course of therapy. Id.

Ms. Lascola complains that the ALJ made her own conclusions about the medical evidence pertaining to Ms. Lascola's healing and recovery from the cervical fusion. She insists that a medical expert opinion is required for a legally valid assessment to be made. Without explanation, she cites Williams v. Astrue. 355 F. App'x 828, 831 (5th Cir. 2009). In Williams, the Fifth Circuit concluded that where a treating physician opined that the claimant could not stand for six hours in an eight-hour work day, the ALJ erred in concluding that the claimant *could* stand for six hours in an eight-hour work day despite the lack of any evidence in the record to support that conclusion. 355 F. App'x 828, 831 (5th Cir. 2009). The court of appeals noted that the ALJ had "looked at the available objective medical evidence, and observed that [the claimant] has 'only mild to moderate stenosis' in her lumbar spine and 'only posterior spurring' in her cervical spine. But there is no evidence to suggest that [the claimant] could perform light work with these conditions." Id. The court added in a footnote that it had previously held that "an ALJ may not—without opinions from medical experts—derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions. Thus, an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions." Id. at 832 n.6.

The referenced holding was announced in Ripley v. Chater, a case also cited by Ms. Lascola without any explanation or analysis. Presumably Ms. Lascola is relying on the Fifth Circuit's

consideration of the claimant's argument that the "ALJ failed to develop the record fully and fairly when he concluded that [the claimant] was capable of performing sedentary work, even though there was no medical testimony supporting this conclusion." 67 F.3d 552, 557 (5th Cir. 1995). The court of appeals observed that although an ALJ should usually request a medical source statement describing the type of work that an applicant is capable of performing, where the ALJ has not done so, the court must determine whether the decision of the ALJ is supported by substantial evidence. Id. In Ripley, the claimant's hearing testimony included statements that he could not sit or stand for more than thirty or forty minutes at a time, that he participates in limited outside activities, and that he can ride in or drive a car but only for short periods. Id. at 554. The ALJ concluded he was capable of performing sedentary work. Id. at 557. The court of appeals remanded, finding that the medical evidence showed that the claimant had a problem with his back, but the only evidence regarding his ability to work came from his own testimony. Id. at 557-58. In so holding, the court rejected the Commissioner's argument that medical reports discussing the extent of the claimant's injuries supported the ALJ's decision. Id. at 558 n. 27. The court explained that "[w]ithout reports from qualified medical experts, however, we cannot agree that the evidence substantially supports the conclusion that [the claimant] was not disabled because we are unable to determine the effects of [claimant's] conditions, no matter how 'small', on his ability to perform sedentary work." Id.

Ms. Lascola argues that the ALJ erred in making determinations concerning Ms. Lascola's healing and recovery from surgery. She argues that there is no evidence in the record that healing is complete or that maximum improvement had occurred. She argues that her testimony does not support a "light" residual functional capacity and insists that the ALJ had no valid factual or legal basis to support the residual functional capacity assigned.

The Commissioner counters that the ALJ has the sole responsibility to determine residual functional capacity. Taylor v. Astrue, 706 F.3d 600, 602–03 (5th Cir. 2012). For example, in Taylor, the claimant argued that the "ALJ substituted his opinion for that of the medical personnel who have treated [the claimant] since the onset of his pain." Id. at 602. The Fifth Circuit rejected the argument, finding that what the claimant had characterized "as the ALJ substituting his opinion is actually the ALJ properly interpreting the medical evidence to determine his capacity for work." Id. at 603. In concluding that substantial evidence supported the ALJ's determination, the court of appeals explained that:

> The records include an MRI that was 'normal,' an EEG test finding that was 'normal,' neurophysiological studies that were 'unremarkable,' and an MRI of the plaintiff's brain that was 'essentially normal.' Even one of [the claimant's] own doctors remarked that '[i]t appears that the patient does not have any anatomical reason [for] his pain.' A different doctor testified similarly at the ALJ hearing.

Id. (alterations in original). The Commissioner argues that here, too, the ALJ was properly interpreting the medical evidence in determining Ms. Lascola's residual functional capacity.

The Commissioner points out that the ALJ must resolve conflicts in the evidence. Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995) ("The Commissioner, rather than the courts, must resolve conflicts in the evidence."). The Commissioner adds that where a claimant challenges an ALJ's alleged failure to develop the record, reversal is only appropriate if the claimant can establish prejudice. Carey v. Apfel, 230 F.3d 131, 142 (5th Cir. 2000) ("This Court will not reverse the decision of an ALJ for failure to fully and fairly develop the record unless the claimant shows that he or she was prejudiced by the ALJ's failure.").

The Commissioner argues that the ALJ's opinion here is supported by substantial evidence. The Commissioner points out, as the ALJ did, that there were significant gaps in Ms. Lascola's

treatment for back and neck pain between January 2015 and October 2016,[7] although she did undergo pain management between June 2015 and June 2016. The Commissioner points out, as did the ALJ, that Ms. Lascola's pain management records do not indicate neurological deficits and focus on her subjective complaints and some decreased range of motion and tenderness.[8] R. at 1130 - 1206. The Commissioner acknowledges, as did the ALJ, that Ms. Lascola reported no relief from her cervical surgery. R. at 75, 949. But the Commissioner argues that the ALJ correctly pointed out that there was no objective evidence to support her statements. R. at 25. As the ALJ noted, the post-operative studies reflected moderate bilateral neural foraminal stenosis at C6-C7, no acute abnormalities, and no cord compression.[9] Id.; R. at 792, 939, 944. When weakness was noted at her May 15, 2017, follow-up at UMC-NO, it was added that the weakness was "from lack of full effort." R. at 931. Based on this evidence, the ALJ concluded that following her surgery, Ms. Lascola would have some limitations, but not to the extent she alleged. R. at 25. The ALJ incorporated physical limitations into the residual functional capacity. The Commissioner argues that the ALJ's decision is supported by substantial evidence.

The court finds that the ALJ's conclusion regarding Ms. Lascola's residual functional capacity through December 29, 2017—the date of the ALJ's decision—is supported by substantial evidence. This is not a case where the ALJ failed to consider material evidence. Nor did the ALJ

---

[7] At the hearing, Ms. Lascola explained that she did not have insurance at the time, but was able to attend pain management with some financial assistance from her husband. R. at 77-78.

[8] In the first few months of treatment Ms. Lascola reported continued pain or that the medication was not working. R. at 1188, 1192, 1196, 1200. In November and December 2015 she was doing well and in February and March 2016, she reported pain well controlled by medication. R. at 1160, 1164, 1172, 1176.

[9] On May 3, 2017, about a week following her April 26, 2017, surgery, Ms. Lascola was admitted to the hospital after the development of a post-operative hematoma. R. at 906. The CT scan reflected post-operative changes, extensive asymmetrical anterior right neck soft tissue swelling "which could be postprocedural, but cellulitis and myositis cannot be excluded," and collection of fluid attenuation that could reflect postoperative fluid. R.at 792. A CT myelogram performed on July 18, 2017 revealed postsurgical changes, moderate bilateral neural foraminal stenosis at C6-7, spinal canal within normal limits, and no cord compression R. at 944. A lumbar MRI was also performed on July 18, 2017. R. at 939. Findings included Grade 1 spondylolisthesis and apparent spondylolysis at L5-S1, chronic discopathy with desiccation, vacuum phenomenon and erosion of the S1 endplate, and bilateral neural foraminal stenosis. Id. The rest of the intervertebral discs were within normal limits. Id.

substitute her own contradictory conclusions for those of Ms. Lascola's physicians. The ALJ considered the claimant's testimony and the medical records cited by Ms. Lascola and the Commissioner here. In January 2014, the consultative examiner performed a physical examination and reviewed x-rays. The neurological examination was intact, she had normal gait and station, and the straight leg test was negative bilaterally. Ms. Lascola could perform all activities of daily living without assistance, including driving.  From January 2015 through October 2016, Ms. Lascola received no treatment with a neurologist. Her pain management records from June 2015 through June 2016 indicate that her pain was generally well controlled and that she was not experiencing neurological issues. When she returned to UMC-NO in October 2016 reporting increased neck and back pain, she had normal strength and normal deep tendon reflexes. R. at 841. The cervical and lumbar MRIs performed in December 2016 showed little change from previous studies showing chronic discopathy, spondylolysis, grade 1 spondylolisthesis at L5-S1, and bilateral foraminal stenosis for the lumbar spine and bilateral neural foraminal stenosis at C6-C7 for the cervical spine. R. at 844-46. In January 2017 when she returned to neurology, she complained of hand numbness and radiculopathy. R. at 848. She had motor strength of 5/5. Id.

After an MRI showing C5-C6, C6-C7 herniated discs and a conclusion that Ms. Lascola had failed conservative treatment and had progression of symptoms, she underwent anterior cervical discectomy with decompression of the spinal cord and osteophytectomy. R. at 903. At discharge, Ms. Lascola ambulated with no episodes of unsteadiness, no loss of balance, and no significant gait deviations. R. at 894. Upon evaluation by an occupational therapist at discharge, Ms. Lascola was limited by pain but functional for basic activities of daily living. R. at 890. It was noted she had no significant functional limitations with self-care or functional mobility tasks. R. at 891. In assessing Ms. Lascola's condition after her cervical fusion, the ALJ focused on the post-

operative studies showing moderate neural foraminal stenosis, but no cord compression. The ALJ found it notable that the examination findings of weakness were accompanied by a note that weakness was due to a lack of effort.  The ALJ assessed Ms. Lascola with a residual functional capacity that includes numerous exertional and postural limitations in recognition of Ms. Lascola's back and neck problems. In doing so, the ALJ weighed the evidence and resolved conflicts. It is not this court's role on appeal to reweigh the evidence. As long as there is sufficient evidence that a reasonable mind could have come to the same conclusion as the ALJ, the substantial evidence standard has been met. The court finds the evidence recited by the ALJ is substantial.

The cases cited by Ms. Lascola are distinguishable. In <u>Williams</u>, the ALJ declined to give controlling weight to the opinions of three treating physicians supporting the claimant's alleged limitations. 355 F. App'x at 829. All the physicians agreed that the claimant could only perform sedentary work, that is, she could not stand for six hours in an eight-hour workday. <u>Id.</u> at 831. Yet, although there was no other evidence to support a finding that the claimant could stand for six hours in an eight-hour work day, the ALJ found that the claimant would be able to do so. <u>Id.</u> Here, in contrast, there are no medical opinions concerning Ms. Lascola's functional abilities that contradict the ALJ's findings. The physical therapy treatment note she cites concerning her functional impairment was based on a self-report questionnaire and was not based on testing by the physical therapist.

In <u>Ripley</u>, there was no evidence of the effect of the claimant's medical condition on his functional abilities besides his own testimony. Here, in the post-surgical period challenged by Ms. Lascola, there is.  An occupational therapist concluded at discharge that she had no significant functional limitations with self-care or functional mobility tasks, the post-operative physical therapist noted no episodes of unsteadiness with ambulation and no significant gait deviations, the

physical therapist's evaluation the following month indicated weakness from lack of full effort, and the physical therapist's evaluation in August 2017 revealed impaired range of motion and decreased upper body strength. In addition to this somewhat conflicting medical evidence, the ALJ recognized Ms. Lascola's testimony and reports that she had no relief from the surgery and continued to experience pain. Ms. Lascola also testified that she cannot lean over to scrub or do the repetitive motion of vacuuming, though she could do light chores like dishes or laundry. R. at. 71. She said she could lift about five pounds and that she had difficulty standing for long periods of time. R. at 73. Like Ripley, there is evidence of a back and neck problem and testimony regarding its effect on her functioning. But unlike Ripley, there is also medical evidence regarding her functioning; the ALJ resolved the conflicts in that evidence in assessing Ms. Lascola's residual functional capacity.

The Ripley case further differs from the present one because the Fifth Circuit also considered the issue of whether to admit new evidence of scar tissue resulting from a back surgery that had only been discovered as a result of a second surgery after the ALJ's decision. 67 F.3d at 556. The court noted that the ALJ had discounted the claimant's complaints of pain as being unsupported by objective evidence. Id. The court determined that the new evidence of scar tissue could have provided an objective basis for the claimant's subjective complaints of pain and was therefore material, supporting a remand for further administrative proceedings. Id. The Fifth Circuit remanded for consideration of the new evidence. Id.

Thus, in both Ripley and Williams, when the Fifth Circuit found there was no evidence to support the ALJ's conclusions about the claimant's ability to work, there was other objective evidence conflicting with the ALJ's conclusions—medical opinions conflicting with the limitations imposed by the ALJ in Williams and evidence of scar tissue that might support the

claimant's subjective complaints of pain in Ripley. Here, there are no medical opinions supporting greater limitations than that assessed by the ALJ and there is no new, objective evidence to support Ms. Lascola's subjective assertions of extreme functional limitations. While it is the ALJ's duty to develop the record, it remains the claimant's burden at Step 4 to establish disability. She has not presented any medical evidence in support of her alleged impairments, despite having had the opportunity to do so in advance of the hearing before the ALJ had such other evidence been available.

Although the ALJ did not obtain a medical opinion after the April 2017 surgery when taking up the case in November 2017, the court finds no error in the ALJ's alleged failure to develop the record. The ALJ's assessment of Ms. Lascola's residual functional capacity is supported by substantial evidence. Further, Ms. Lascola has not shown any prejudice resulting from the ALJ's failure to obtain a medical opinion after April 2017. Accordingly, Ms. Lascola's second assignment of error should be rejected.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 11) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 13) be GRANTED.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 31st day of March, 2020.

Janis van Meerveld
United States Magistrate Judge